UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DOROTHY CHARLEY, Individually and as
Administrator of the Estate of LADALE KENNEDY,

                    *Plaintiff*,

       -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,
CAPTAIN W. VESNESKE, CAPTAIN GRAVLIN,
SERGEANT R. PAIGE, SERGEANT D. BASFORD,
SERGEANT LANGDELL, LIEUTENANT T. DEBYAH,
LIEUTENANT D. REYNOLDS, CORRECTION OFFICER R.
HOOKER, CORRECTION OFFICER M. PHILLIPS,
CORRECTION OFFICER K. MAURER, CORRECTION
OFFICER G. TYLER, CORRECTION OFFICER C. COX,
CORRECTION OFFICER E. DRUMMATTER, CORRECTION
OFFICER K. PHILLIPS, CORRECTION OFFICER J. HEALY,
CORRECTION OFFICER E. GAVIN, CORRECTION OFFICER S.
HARMER, CORRECTION OFFICER S. DALEY, REGISTERED
NURSE B. HUNDLEY, NURSE S. BIONDO, COUNSELOR
ORC CAMPBELL, CORRECTION OFFICERS JOHN/JANE
DOES # 1-5 AND MEDICAL STAFF JOHN/JANE DOES # 6-
10,

                    *Defendants.*

-----------------------------------------------------------------X

**FIRST AMENDED
COMPLAINT**

Jury Trial Demanded

Case No.: 9:25-cv-01020
(AMN) (TWD)

      Plaintiff DOROTHY CHARLEY, Individually and as Administrator of the Estate of
LADALE KENNEDY, by and through her attorneys, Ellie Silverman Law P.C., as and for her
First Amended Complaint alleges as follows:

## PRELIMINARY STATEMENT

      1.     Plaintiff DOROTHY CHARLEY brings this action against the Defendants for the
wrongful death of her son Plaintiff LADALE KENNEDY ("Plaintiff" or "Mr. Kennedy" or
"Ladale Kennedy"), which resulted from a violation of his civil rights, while he was incarcerated
at Upstate Correctional Facility ("Upstate" or "the Prison"), a Supermax facility.

      2.     On July 31, 2022 at approximately 1:07am or 1:08am, LADALE KENNEDY was
found not breathing in his cell at Upstate after a barbaric sequence of events ("incident") with
correction officers, some of which, was caught on camera.

3.      On July 30, 2022 at approximately 2:04pm, less than twelve hours before his pronounced death[1], a merciless military-style swarm of LADALE KENNEDY's cell ensued in order to conduct a cell-search after he, in Defendants' own words, refused to hand over some mess hall items.

4.      A heartless cell-extraction occurred, which involved Defendants ramming LADALE KENNEDY's cell door open while wearing swat-style body armor and shields before dragging him out from under his bed where he was hiding in fear and begging "I'm sorry sir, please don't kill me."

5.      The Defendants proceeded to use extreme force on LADALE KENNEDY, including an excessive disbursement of pepper spray and the dehumanizing and medieval "spit mask" on his face while violently holding his head back under a showerhead, seemingly waterboarding him.

6.      Defendants carried LADALE KENNEDY by each limb back to his cell, pulling his face, neck and head back and upwards by the strings of the spit mask, allegedly because he was falsely reported as having "refused to walk", and when they put him back in his cell, he was falsely reported as "refused to stand".

7.      Defendants then abandoned LADALE KENNEDY to lay lifeless alone in his cell, without medical attention, until 1:07am on July 31, 2022.

8.      It was flippantly reported in minimal documentation that Defendants last saw Plaintiff "alive" at approximately 12:00am, but the video depicts Defendants barely glazing into his cell with a flashlight before moving on to the next cell.  Therefore, it is unknown when Defendants actually last observed Plaintiff alive.

9.      At approximately 5:30pm, during nursing rounds, LADALE KENNEDY appears to be unresponsive to Defendants' attempts at communicating with him through the cell door. Notwithstanding, he is not "checked on" again until approximately midnight, more than six (6) hours after not responding to Defendants' attempt to communicate.

10.     When LADALE KENNEDY's body was finally accessed, there was a trail of blood on the ground in front of his cell and a hematoma was discovered on his right eyebrow, in addition to a bleeding 0.5cm laceration, while photographs depict his face, eye and body swollen and bruised with observable dried blood.

11.     EMTs did not arrive until approximately 1:42am, despite LADALE KENNEDY's body being allegedly discovered at 1:07am – the Defendants who observed his lifeless and presumably unconscious body did not enter his cell for nearly eight (8) minutes, peering inside at his motionless person with flashlights for eight minutes before making any life-saving attempts. To be clear, the Defendants stood for four hundred and eighty (480!) seconds while observing a lifeless incarcerated individual under their care before entering his cell.  This time period was not

_____

[1] Notably, the State of New York has not provided any documentation regarding this case. The County Coroner finally provided this office with Plaintiff's autopsy report on or about August 1, 2025–despite multiple requests, calls, and follow-ups over the course of over one year– his cause of death is currently listed as "undetermined" with his time of pronouncement of 2:01 am on July 31, 2022.

accurately reported in the documents.

12.     Defendants have still not released LADALE KENNEDY's final assessment following an investigation, or any records, for that matter, from any official investigation into his death, listing the investigation still three years later as "pending". Defendants deprived Ms. Charley of her right to/of sepulcher and basic dignity that should have been afforded to the mother of Plaintiff.

13.     In the month leading up to LADALE KENNEDY's death at the facility, he was forced in solitary confinement, deprived of visits and privileges with documented paranoia and hallucinations[2], begging to be transferred and grieving/accusing some of the Defendants involved in his death of abuse, harassment and threats on his life.

14.     The video sequence of LADALE KENNEDY is haunting as Plaintiff begs for forgiveness, for relief, for rest and for air while being forced to stand and face a corner for upwards of 15 minutes. He remains surrounded by Defendants suffocating him with a spit mask (while doing who knows what else to him); he is depicted as being carried facedown by each limb, including by his head and neck, down the hallway; his chokes as Defendants waterboarded him using a spit mask are audible; and his constant "I'm sorry sir" and begging to be able to breathe and to live are heard throughout these sequence of events. The video also depicts a group of officers violently dragging and pulling Plaintiff's near naked body out from under his bed where he was hiding in fear.

15.     LADALE KENNEDY stated he cannot breathe countless times.

16.     LADALE KENNEDY is a victim of a corroded facility practice and few continue to try to shine a light on these Upstate terrors[3]. For decades, victims, news reporters, investigators and lawyers have been shouting, highlighting, writing articles, going to the press, and litigating (either pro-se or with counsel) about it and nothing has been done. All while Ladale Kennedy and other men similarly situated who are serving their time, trying to rehabilitate themselves, have to look over their shoulder every minute of every day in fear that today may be the day a racist or high-tempered officer is angry about a past grievance, a potential future complaint, their mental health issues or just decides to have a little fun. Many times, the victims' claims are disregarded as untruths but the long history of eerily consistent similar details paints the true picture.

---

[2] More than 33% of individuals in solitary confinement experience psychosis within the first fifteen (15) days. *See* Grassian, Stuart. "Psychiatric Effects of Solitary Confinement." *Washington University Journal of Law & Policy* vol. 22 (2006).

[3] For example, on June 1, 2023, as a result of self-advocacy, correction officers at Upstate brutally beat Mr. Khalil Jennings–while he was handcuffed– hogtied him and abandoned him in his cell, resulting in a broken nose, broken ribs, a fractured spine, a leak of fluid and blood around his lungs, nerve damage in his hand, and bruising and lacerations to his face. Mr. Jennings could not breathe or speak, and if he hadn't had a cellmate who could call for help, he might have died too. *See Jennings v. Durham et al.*, Case 9:24-cv-00611-DNH-DJS (NDNY, 2024).

17.    The violations of Plaintiff's civil rights as claimed here therefore come at no surprise and the abuse by officers followed by their lies and false charges continues.

18.    LADALE KENNEDY was pronounced dead on July 31, 2022 by Dr. John McCormack of Alice Hyde Medical Center on 2:01 a.m.

19.    Plaintiff DOROTHY CHARLEY seeks justice for the Defendants' deliberate violations of Plaintiff LADALE KENNEDY's human and constitutional rights.  This lawsuit demands accountability for the Defendants' senseless actions, and damages for the catastrophic injuries and death they caused.

## JURISDICTION AND VENUE

20.    This action is brought pursuant to 42 U.S.C. § 1983 for violations of rights secured by the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

21.    This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

22.    Venue is proper pursuant to 28 U.S.C. § 1391 in the Northern District, which is the judicial district where the events giving rise to this claim took place.

23.    Plaintiff's wrongful death lawsuit against The State of New York is being litigated in the Court of Claims under Claim No. 142420 with Hon. Judge Zainab A. Chaudhry presiding.

## JURY DEMAND

24.    Plaintiff DOROTHY CHARLEY demands a trial by jury in this action on each of her claims for which a jury trial is legally available.

## THE PARTIES[4]

25.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

26.    Plaintiff DOROTHY CHARLEY is a citizen of the United States.  Plaintiff LADALE KENNEDY was a citizen of the United States and of the State of New York.  At all times relevant to this complaint, Plaintiff LADALE KENNEDY resided in the State of New York.

---

[4] Despite Plaintiff's best efforts and extraordinary due diligence, Plaintiff is unable to confirm every individual that can be identified as a Defendant.  The records contain redactions, there is no investigation report and no final investigation results as the State of NY and all investigating agencies continue to state that the investigation is still pending. The records that are not redacted contain conflicting information when cross referenced by and between the reports as well as when compared to the video footage.  Plaintiff reserves the right to request permission to substitute the DOES for named Defendants and relate back to the time of the filing given the serious nature of this case and the many roadblocks put up by defendants and their agents/employees and given that the identifying information of all potential defendants is in the sole possession, custody and control of The State of New York, DOCCS and all current named defendants.  Additionally, not all first names are made known to Plaintiff at this time.

4

27.     Defendant NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION ("DOCCS" or "the Department") maintains, oversees and is responsible for Upstate.  Acting through the State of New York, the Department is authorized to maintain correctional facilities and is responsible for maintaining and supervising correctional facilities in the State of New York.  The Department assumes the risks incidental to the maintenance of correctional facilities and the employment of correctional officers and medical officials under its employ.

28.     DOCCS is a public entity bound by both Title II of the American with Disabilities Act ("ADA") and the Rehabilitation Act of 1973.

29.     DOCCS is responsible for ensuring that people sentenced to a term of imprisonment in a State correctional facility receive appropriate care and services required by law.

30.     Defendants R. HOOKER, M. PHILLIPS, K. MAURER, G. TYLER, C. COX, E. DRUMMATTER and K. PHILLIPS worked at all relevant times as New York State Correction Officers at Upstate.  HOOKER, M. PHILLIPS, MAURER and TYLER were main participants in the torturing of Plaintiff.  COX was present and had the opportunity to intervene at various stages of the torture and failed to do so.  DRUMMATTER was present and had the opportunity to intervene at various stages of the torture and failed to do so, additionally DRUMMATTER utilized the handheld video recording device, manipulated the placement of the device in order to record only certain aspects of the events.  K. PHILLIPS was the "steady" C.O. who "found" Plaintiff at 1:00a.m. and failed to make an earlier round in violation of protocol, practice, procedure and rules. They are sued here in their individual capacities.

31.     Defendants R. PAIGE, D. BASFORD and LANGDELL worked at all relevant times as New York State Correction Sergeants at Upstate.  PAIGE was notably, a main participant in the torture of Plaintiff.  Both PAIGE and BASFORD were present and failed to intervene despite having the opportunity to do so.  LANGDELL was the area supervisor and responsible for the over six (6) hour delay in rounds and thus delays in attempting of life-saving measures.  They are sued here in their individual capacities.

32.     Defendants T. DEBYAH and D. REYNOLDS worked at all relevant times as New York State Lieutenants (and/or Watch Commander Lieutenants) at Upstate.  DEBYAH issued the final order directing Plaintiff to leave his cell prior to the assault.  REYNOLDS authorized the use of the spit mask.  Both DEBYAH and REYNOLDS were present and had the opportunity to intervene at several stages of this event and failed to do so.  They are sued here in their individual capacities.

33.     Defendant W. VESNESKE and GRAVLIN worked at all relevant times as New York State Correction Captains at Upstate.  VESNESKE and GRAVLIN were present for the torture and authorized the use of force (UOF) and utilization of chemical agents on Plaintiff on July 30.  Both were present and had the opportunity to intervene at various stages and failed to do so.  They are sued here in their individual capacities.

34.     Defendants B. HUNDLEY and S. BIONDO worked at all relevant times as New

5

York State Correction Nurses at Upstate. HUNDLEY approved the use of OC Spray on Plaintiff on July 30. BIONDO falsely claimed that Plaintiff had "no" injuries after the July 30 assault. They are sued here in their individual capacities.

35.     Defendants J. HEALY and E. GAVIN worked at all relevant times as New York State Correction Sergeants at Upstate. They threatened Plaintiff's safety and well-being. They had the opportunity to intervene to stop wrongdoing and failed to do so. They are sued here in their individual capacities.

36.     Defendant S. HARMER worked at all relevant times as a New York State Correction Officer at Upstate. He took post-use of force photographs and had the opportunity to intervene to stop wrongdoing and failed to do so. He is sued in his individual capacity.

37.     Defendant S. DALEY worked at all relevant times as a New York State Correction Officer at Upstate. He performed a cell frisk search of Plaintiff's cell on July 30, 2022. He had an opportunity to intervene to stop the wrongdoing and failed to do so. He is sued in his individual capacity.

38.     Defendant Counselor ORC CAMPBELL worked at all relevant times as a New York State Counselor at Upstate. She was responsible for LADALE KENNEDY's safety and well-being and failed to acknowledge Plaintiff's declining mental health; Plaintiff's repeated requests to be moved; repeated requests for visits; repeated details about how and why he felt threatened; and allegedly on or about July 29, 2022 allegedly asked Plaintiff to sign unknown paperwork. Additionally, ORC CAMPBELL allegedly confirmed that as of July 29, 2022, he was doing fine to DOROTHY CHARLEY, Plaintiff's mother and was her primary contact at Upstate.

39.     At all relevant times, Correction Officer JOHN/JANE DOES # 1-5 and Medical Staff JOHN/JANE DOES # 6-10 are sued in their individual capacities and are referred to as CO DOES and Medical Provider DOES, respectively. DOES include but are not limited to: the Nurse and Correction Officer who performed the rounds at 5:00p.m. and failed or otherwise did not go into Plaintiff's cell and failed to give Plaintiff his medication at 5:00p.m; as well as the Correction Officer who was the "steady" Correction Officer through 11:00p.m. and failed to do rounds. These names are in the sole possession, custody and control of the State of New York and specifically, DOCCS.

40.     All named Defendants inclusive of DOES defendants are referred to collectively in this complaint as "the defendants" or "Defendants".

41.     At all relevant times, the Defendants were employed by the State of New York and/or DOCCS and acted under color of law and in the course and scope of their duties and authority as officers, agents, servants, and employees of the State of New York and/or DOCCS. Accordingly, they are entitled to representation in this action by the New York State Attorney General's Office upon their request.

42.     As officials employed by DOCCS, acting under the color of law in the course and scope of their duties and authority, the Defendants were responsible for not violating incarcerated

6

individuals' rights under 42 USC § 1983.

43.     As officials employed by DOCCS, a public entity bound by both Title II of the ADA and the Rehabilitation Act of 1973, the Defendants were responsible for recognizing when incarcerated individuals display signs of medical and mental health emergencies and for taking appropriate measures to ensure that incarcerated individuals in such distress receive immediate medical and mental health attention.

44.     As officials employed by DOCCS, a public entity bound by The Civil Rights Act of 1871, the Defendants had a responsibility to not discriminate against Plaintiff based on race.

45.     As officials employed by DOCCS, a public entity bound by the Constitution of the United States, a government may not retaliate against individuals for exercising their rights under the First Amendment.

46.     Upon information and belief, the Defendants are citizens of the United States and citizens and residents of the State of New York.

47.     At all relevant times, Defendants violated clearly established constitutional rights, of which a reasonable person operating in their position would have known and corrected.

48.     The conduct of the Defendants caused Plaintiff to suffer from mental and physical anguish.

49.     The conduct of the Defendants caused Plaintiff to suffer violations of his constitutional rights.

50.     The conduct of the Defendants caused Plaintiff to die.

## STATEMENT OF FACTS

51.     Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

52.     On or about March 31, 2021, Gov. Andrew Cuomo signed the "HALT Act" into law, which restricted the placement of incarcerated individuals into solitary confinement and amended the New York Corrections Law.  This law went into effect on March 31, 2022.  After going into effect,  DOCCS employees have continued to protest against the new law.

53.     By way of background, Plaintiff was a black male designated as a Medical Level 3 and Office of Mental Health ("OMH") Mental Health Service Level ("MHSL") 3 when he arrived at Upstate Correctional Facility on June 13, 2022.  He had documented preexisting medical conditions, including pre-diabetes and mental health disabilities.  Plaintiff was also taking mental health medications, including Vistaril and continuously seeking mental health help.

54.     At all relevant times Counselor ORC CAMPBELL was Plaintiff's assigned

counselor while at Upstate.

55.    In the months leading up to the incident detailed *supra* and *infra*, Plaintiff was the target of unwarranted strip-searches, cell searches, the victim of racist slurs and overall, was scared for his life.  He was experiencing severe mental health symptoms, including hallucinations and paranoia, yet solely prescribed medication for anxiety.

56.    His mother, Dorothy Charley, called the facility and spoke with nurse Blackburn July 11, 2022– twenty (20) days before his death–to report her concern over his apparent decompensation in solitary confinement and spoke with ORC Campbell on or about July 29, 2022.

57.    Nurse Blackburn had previously referred Plaintiff to OMH on July 9, 2022 due to a worrisome sick call slip.

58.    During his entire incarceration at Upstate, Plaintiff was under 24/7 solitary confinement, long acknowledged as torture[5], as correction officers were depriving him of all of his recreation and out of cell time in direct violation of New York State Correction Law 137.

59.    Correction officers denied Plaintiff access to the commissary, essentially depriving him of almost all food.  While incarcerated at Upstate, Plaintiff was barely eating the food provided by the prison as he believed security staff was tampering with his food trays.  Plaintiff reported this to his mother, Dorothy Charley.  When Plaintiff was attacked on July 30, 2022, a number of mess hall trays and other mess hall items were discovered in his cell.  It is evident through Plaintiff's grievances, misbehavior reports and reported experiences to his mother that his mental health condition was inextricably linked to food and the correction officers delivering said food.  Paranoia and fear of malicious food tampering is long reported and well understood as a symptom of psychosis.[6]  And the correction officers abused and beat him in response.

60.    Plaintiff repeatedly requested protective custody ("PC") at Upstate–including on June 25, 2022, June 27, 2022, July 4, 2022, and July 5, 2022–due to individuals affiliated with the Bloods harassing and attacking him.  Plaintiff remained in the same cell (11-C2-45B) for the entirety of his incarceration at Upstate, from June 13, 2022 until his death on July 31, 2022.

61.    Plaintiff was consistently harassed and abused by security staff.  Upon information and belief, Defendants C. COX, E. GAVIN, J. HEALY and R. HOOKER were spearheading many of these unprovoked and unwarranted abuses and assaults.  As such, Plaintiff filed grievances.  Many of the responses disregarded and ignored Plaintiff's complaints and fears or alternatively, many of his grievances were dismissed and left uninvestigated as a result of his death.

---

[5] Solitary confinement is government torture that inflicts devastating and deadly harm. Solitary has been opined to cause heart disease, anxiety, depression, psychosis and could cause people to engage in self-harm. *See* Lobel, J. "Prolonged Solitary Confinement and the Constitution." *University of Pennsylvania Journal of Constitutional Law* (2008).

[6] *See* Matthew, Joanne M., Judy L. Sheehan, Lisa A. Uebelacker, Laura Drury, Linda Damon, and Patricia R. Recupero. "The Patient With Paranoia." *Inpatient Psychiatric Nursing: Clinical Strategies & Practical Interventions* (2012); and *see* Yum, Sun Young. "The starved brain: eating behaviors in schizophrenia." *Psychiatric Annals* 35, no. 1 (2005).

62.     For example, on June 30, 2022, Defendant C. COX obstructed Plaintiff from receiving adequate medical attention by interrupting, intervening and physically involving himself in Plaintiff's HIPAA-protected conversations with medical staff.  As a result of this incident, Plaintiff filed a complaint requesting to be moved to another housing block away from Defendant C. COX or for C. COX to be moved away from Plaintiff as he was concerned for his safety.  This request was denied and Defendant C. COX was determined to be "acting in good faith".

63.     On July 2, 2022, Plaintiff received a misbehavior report written by Defendant R. HOOKER for refusing to give up his food tray and tossing it onto the floor, resulting in a loss of phone privileges and his tablet, isolating him and leaving him with next to nothing to do in his cell.

64.     On July 8, 2022, Defendant J. HEALY wrote Plaintiff a ticket for allegedly engaging in disruptive behavior, resulting in a further loss of phone privileges, ensuring that Plaintiff remained isolated from his family and loved ones.

65.     On July 12, 2022, Plaintiff requested to be removed from Upstate Correctional Facility and the Residential Rehabilitation Unit ("RRU") due to the negligence and abuse at the hands of both staff and the incarcerated population.  This grievance was also dismissed and closed, as Plaintiff passed away before any action could be taken.  On this same day, Defendant J. HEALY wrote Plaintiff a misbehavior report–resulting in Plaintiff losing a year of good time and an additional 365 days of solitary confinement–allegedly for turning aggressively towards officers.  There are conflicting reports, and Plaintiff himself cannot be interviewed.  Another report says he was combative, kicking at staff *while restrained*, while a third report falsely alleges that he spat at a CO.  Plaintiff was in solitary confinement and clearly experiencing severe mental health symptoms, should never have been disciplined for such an incident–and certainly should not have been beaten. This was in violation of his rights under the ADA, among other human rights.

66.     On July 20, 2022, Plaintiff reported that he was improperly handcuffed during movement without any new sanction or order, in violation of Correction Law 137.  In that same report, Plaintiff wrote that correction officers were forcing him to be involved in inappropriate sexual activity, that his human rights were being violated at the facility, that he was getting threatened by staff and that he was almost murdered during the aforementioned incident on July 12, 2022.  This report was handled as a report of sexual abuse by the facility, but not decided timely and then denied and closed post-mortem.

67.     On July 23, 2022, Plaintiff reported that Defendant R. HOOKER, while giving Plaintiff his breakfast tray, threatened him and whispered that Plaintiff was "lucky [CO R. HOOKER] and [CO R. HOOKER's] officers don't murder [Plaintiff]."  The report continues, stating that these officers threatened to "psychologically and mentally torture [Plaintiff]" and that they were working with the Bloods.  Plaintiff then asks that he be transferred from the facility before an officer could murder him, specifically Defendants R. HOOKER, E. GAVIN and C. COX.  This complaint was also not investigated due to Plaintiff's death.

68.     On July 30, 2022, Defendant R. HOOKER wrote Plaintiff a misbehavior report for

refusing to close his feed-up hatch, alleging that as a result of the inhuman act of violence against Plaintiff, they did a complete cell search and found some torn sheets and blankets in his cell, a couple of messhall trays and cups, and a bucket containing "unknown liquids emitting a putrid odor." Plaintiff LADALE KENNEDY's complaint herein accrued on or about July 30, 2022, at approximately 2:04pm and continued through July 31, 2022 to approximately 1:07am.

69. Less than twelve hours before his pronounced death, an Unusual Incident Report was written, describing a military-style swarm into Plaintiff's cell in order to conduct a cell-search after Plaintiff refused to hand over mess hall items.

70. This swarm of officers involved Defendant R. HOOKER and resulted in a savage cell-extraction–involving ramming Plaintiff's cell door open and dragging him out from under his bed where he was hiding–and incomprehensible force being used on Plaintiff in addition to a spit mask, after which four security staff members carried and dragged him by each limb–including his head–back to his cell, allegedly because he "refused to walk", and when they put him back in his cell, he allegedly "refused to stand."

71. The majority of the sequence of events (as far as the records show thus far) was filmed on handheld camera by Defendant DRUMMATTER.

72. After ramming Plaintiff's door, Defendant R. PAIGE sprayed Plaintiff three (3) times with Sabre MK-4 OC spray, as approved by Defendant HUNDLEY.

73. Plaintiff's cell door was then opened and Defendant M. PHILLIPS entered with his swat shield raised, immediately striking Plaintiff, who hid under his bed in terror as a result. Defendants W. VESNESKE, R. PAIGE, D. BASFORD, T. DEBYAH, D. REYNOLDS, R. HOOKER, M. PHILLIPS, K. MAURER, C. COX and G. TYLER can next be heard yelling "stop resisting, put your hands behind your back" while dragging Plaintiff out from under his bed.

74. Plaintiff desperately yelled out, "I'm sorry, I'm so sorry, I'm so sorry please, don't kill me, I'm sorry" over and over.

75. Defendants R. HOOKER, M. PHILLIPS, K. MAURER and G. TYLER are piled on Plaintiff the ground at this point, violently attacking and holding him down despite his pleas for mercy. Defendant DRUMMATTER purposefully remained outside of the cell, protecting the abusive actions of the Defendants.

76. At one point, you can hear Plaintiff audibly struggling to breathe and he says "I can't breathe."

77. Plaintiff was speaking incoherently once Defendants W. VESNESKE, R. PAIGE, D. BASFORD, T. DEBYAH, D. REYNOLDS, R. HOOKER, M. PHILLIPS, K. MAURER, C. COX and G. TYLER violently placed him on the wall outside of his cell.

78. Defendants W. VESNESKE, R. PAIGE, D. BASFORD, T. DEBYAH, D. REYNOLDS, R. HOOKER, M. PHILLIPS, K. MAURER, C. COX and G. TYLER then forced

Plaintiff to walk–with Defendants mostly dragging him–
with his pants at his ankles–he was not wearing
underwear–until one Defendant finally directed the
others to "pull his pants up."



79.     Defendants W. VESNESKE, R. PAIGE,
D. BASFORD, T. DEBYAH, D. REYNOLDS, R.
HOOKER, M. PHILLIPS, K. MAURER, C. COX and
G. TYLER dragged Plaintiff to the infirmary as he cried,
"I can't breathe."

80.     Once in the decontamination room,
Defendants W. VESNESKE, R. PAIGE, D. BASFORD,
T. DEBYAH, D. REYNOLDS, R. HOOKER, M. PHILLIPS, K. MAURER, C. COX and G.
TYLER forced Plaintiff's head back and turned on the shower, telling him to "stop spitting" while
water was getting forced into his eyes, nose, and down his throat.

81.     This "spitting" was the manufactured reason why Defendants put the spit mask on
him–as approved by Defendant D. REYNOLDS–which produced the same effect as
waterboarding when they tilted his head back under the shower.

82.     Defendants told Plaintiff to "stop resisting" while Plaintiff said "I'm sorry, don't
kill me."  Despite the begging and pleading, Plaintiff was still being forced under the shower at
this time.   The handheld camera–as in Defendant DRUMMATTER–was purposefully not
depicting what they were doing to Plaintiff under the shower head.

83.     Defendants W. VESNESKE, R. PAIGE, D. BASFORD, T. DEBYAH, D.
REYNOLDS, R. HOOKER, M. PHILLIPS, K. MAURER, C. COX and G. TYLER then removed
the spit mask and dragged Plaintiff to a holding cell, soaking wet, tripping over his pants which
were again pulled down and dragging on the ground, exposing his entire lower half and genitalia,
while Defendants yelled at him to walk (which was clearly an act as they were well aware that
Plaintiff could not walk on his own at that time).

84.     In the holding pen, Defendants W. VESNESKE, R. PAIGE, D. BASFORD, T.
DEBYAH, D. REYNOLDS, R. HOOKER, M. PHILLIPS, K. MAURER, C. COX and G. TYLER
again put the spit mask on Plaintiff.  Plaintiff is depicted as slumped against and facing the wall
at this point, unable to stand up, with Defendants circling him.

85.     Plaintiff continued to say "I'm sorry sir, I'm sorry sir, don't kill me, I can't
breathe."

86.     Defendant S. BIONDO arrived at the holding pen and asked how Plaintiff was, to
which he responded "I can't breathe ma'am."  In response, Defendant S. BIONDO stated "alright,
well stop spitting." (again clearly an act as they were well aware that Plaintiff was not spitting).

87.     In Defendant S. BIONDO's injury report, she wrote that Plaintiff had no injuries,

that he was speaking clearly and that the spit mask was on.

88.     Defendants W. VESNESKE, R. PAIGE, D. BASFORD, T. DEBYAH, D. REYNOLDS, R. HOOKER, M. PHILLIPS, K. MAURER, C. COX and G. TYLER then asked Plaintiff if he could stand up on his own, to which he responded "no I can't sir."

89.     One Defendant then casually stated that Plaintiff was standing up on his own at that moment, when two Defendants were clearly propping him up against the wall–with one Defendant holding the spit mask tightly against Plaintiff's face, all the while Plaintiff was telling them that he could not breathe and saying "I don't want to die, please don't kill me, I can't breathe" while they continued to tell him "stand up, face the wall, follow directions, stop pushing off the wall."



90.     Four Defendants held Plaintiff pressed face first against the wall, with the spit mask tightly bound across his face, for approximately ten (10) minutes.

91.     At one point Plaintiff yelled "nurse I'm about to pass out," and the Defendants in response ordered him to "stand up and face the wall."

92.     Plaintiff asked to be allowed to sit down and Defendants said no.

93.     Defendants R. HOOKER, M. PHILLIPS, K. MAURER and G. TYLER then carried Plaintiff face down, each holding onto one limb, back to his cell, while he said over and over "I can't breathe."

94.     Plaintiff then desperately told Defendants that he would try to walk and that he couldn't breathe, and when Defendants put him down, he was clearly unable to even hold himself upright.

95.     Defendants R. HOOKER, M. PHILLIPS, K. MAURER and G. TYLER again picked him up by each limb in the same fashion and dragged/carried him back to his cell.

96.     One Defendant is depicted as holding onto the spit mask's strings, clearly pulling Plaintiff's head and neck back and up.

97.     When Defendants returned Plaintiff to his cell, Defendant DRUMMATTER purposefully pointed the handheld camera at the back of the escorting officers so that the camera could not see Plaintiff, but coincidentally, the Defendants can be heard yelling at Plaintiff to "stand up."

12

98.     Defendants then locked Plaintiff back in his cell, leaving him there without any medical attention.  It is unclear what happens between then and 5:30pm, which is when the stationary security footage next picks up.  Upstate Correctional Facility confirmed that there is no footage preserved for the handful of hours that passed between then and 5:30pm.

99.     Defendants claim that a CO saw Plaintiff alive at 12:00am.  This is "depicted" on video, with Defendant K. PHILLIPS barely glancing into Plaintiff's cell with a flashlight before moving on.  There is therefore no way to know if Plaintiff passed away much earlier, or in fact at what time he actually passed, especially given the absence of the autopsy report.

100.    The reporting documentation received by Plaintiff thus far has yielded conflicting information as has the video footage when compared with the documentation.  For example (and this is not even close to an exhaustive list of discrepancies but there is more documentation Plaintiff is still waiting on and despite best efforts, cannot obtain all records or the autopsy report/medical examiner's file as of the date of this filing):

- The three inexplicable outrageous hours of disappeared camera footage.
- Defendant GRAVLIN is not listed as an officer present until DEBYAH submitted an "addendum" acknowledging that GRAVLIN authorized the use of force and "not as previously stated by Captain Vesneske."  Which begs the question, which Defendant actually (if anyone) authorized the use of force and chemical agents?
- Some reports reflect that Plaintiff was observed as lifeless at 1:07, others say 1:08.
- Some reports state that officers responded and entered Plaintiff's cell to perform life saving measures at 1:10, however the footage tells a different story indicating that it was in fact eight (8) minutes from the time an officer observed Plaintiff lying lifeless on the ground to when responding officers entered the cell.
- Defendants claim Plaintiff was spitting on them…yet it is clear from the footage that there was no spit.  The only water coming out from near, at or around Plaintiff's body was the water splashing as a result of him being waterboarded.
- Per the reports, Plaintiff refused to walk back to his cell, when in reality the footage shows that Plaintiff clearly was physically unable to do so.  In fact, he made every effort to do so, claimed he was unable to breathe and fell down.
- PAIGE also needed to prepare an "addendum" wherein he states that he tried to interview Plaintiff while in the decontamination room however, the video shows no evidence of this alleged attempt to interview Plaintiff while in the decontamination room.  PAIGE also adds that Plaintiff "refused" to make a comment.  This begs the question, is it even possible to refuse to "make a comment" while being waterboarded?

101.    During the vast majority of this sequence of events, Plaintiff was forced to be escorted with his pants down around his ankles.

102.    It is unclear who, if anyone, actually authorized the use of chemical agents.

103.    It is unclear who, if anyone, actually authorized the use of force.

> I/I Kennedy-00a1648 had refused all staff direction to exit his cell for a suspicion cell search authorized by area supervisor Sgt. Paige. At this time after receiving authorization from Captain Vesneske to use chemical agents and any force necessary to gain compliance, I, Lieutenant Debyah gave I/I Kennedy a final order to exit the cell, which he refused. At this time force became necessary.    Authorization was granted by Captain Gravlin not as previously stated by Captain Vesneske

104.    Further, at approximately 5:30pm, during nursing rounds, Plaintiff already was seemingly unresponsive to Defendants CO DOES and Medical Provider DOES attempts at communicating with him through the cell door, and yet, he is not "checked on" again until approximately midnight, once again calling into question his time of death.

105.    When Plaintiff's body was found unresponsive in his cell, there was a trail of blood on the ground in front of his cell, and a hematoma was discovered on his right eyebrow, in addition to a 0.5cm laceration and blood on his face, with photographs depicting his face, eyes, and body completely swollen.

106.    EMTs did not arrive until 1:42am, when Defendants discovered Plaintiff's body at 1:07am – and the officers who found his body did not enter his cell for nearly eight (8) minutes, instead, just peered inside at his lifeless body with flashlights for eight minutes before making any life-saving attempts.

107.    When DOROTHY CHARLEY finally was able to see her son, she observed boot prints on his lifeless body.

108.    Mr. Kennedy was observed to have a right temporal laceration, bilateral rib fractures including but not limited to a left 10th posterior rib fracture with associated hemorrhage that was potentially one week old, and some which occurred allegedly post CPR, a hematoma - right temporal scalp, facial lacerations, left arm lacerations and abrasions, lacerations on his right thumb and an abrasion on his right elbow, foamy green-white tracheal contents and brown mucoid stomach contents.  He was also documented as having a head injury associated with a brain concussion and noticeable dried blood.

109.    To date, no official cause of death has been released.  The New York State Commission of Correction has not finished their investigation in the three years post-death; the Justice Center did not investigate, declaring the death as a non-suicide, as they investigate all deaths reported as suicides; DOCCS did not release any relevant records to Plaintiff, stating that they could not release documents pertaining to an open investigation; the New York State Police allege that their investigation is still somehow ongoing and therefore they are unable to release any records to Plaintiff; the New York State Office of the Attorney General has not yet released any records; and the Franklin County Coronor's office finally produced an autopsy report Medical Examiner investigation/records with the manner and cause of death as Undetermined.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 (Excessive Force, Violation of Due Process & Right to Be Free From Cruel & Unusual Punishment)

110.     Plaintiff     realleges     and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

111.     Defendants used excessive and unconstitutional force against Plaintiff and/or had the opportunity to but failed to intervene to stop the use of excessive and unconstitutional force against Plaintiff, which directly led to Plaintiff's death.

112.     The dragging of Plaintiff out from under his bed was done maliciously and sadistically and constituted cruel and unusual punishment.



113.     The forcing Plaintiff to be mostly naked during the entire sequence of these events was done maliciously and sadistically and constituted cruel and unusual punishment.

114.     The use of force against Plaintiff was done maliciously and sadistically and constituted cruel and unusual punishment.

115.     The utilization of chemical agents against Plaintiff was done maliciously and sadistically and constituted cruel and unusual punishment.

116.     The use of waterboarding against Plaintiff was done maliciously and sadistically and constituted cruel and unusual punishment.

117.     Here, the conduct is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.  See Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005).

118.     Defendants' wrongdoings described above in the Plaintiff's Statement of Facts, which caused Plaintiff to suffer physical injuries including death, amounted to excessive force in violation of the Constitution.

119.     Here, Plaintiff satisfied the subjective prong that Defendants acted in bad faith and that the actions, as described above, violated the standards of decency.

120.     Defendants failed to protect Plaintiff from the conditions that posed a substantial risk of harm and the Defendants were aware of the risks to Plaintiff's health and safety and disregarded these substantial risks of harm.

121.    The unlawful conduct of Defendants was willful, malicious, oppressive and reckless and was of such a nature that punitive damages should be imposed.

122.    Defendants' conduct was entirely unjustified and their actions constituted excessive use of force.

123.    Defendants deprived him of his rights under the Eighth Amendment when they threatened him so severely that he was significantly physically and psychologically injured, directly leading to his death.

124.    Defendants, by unjustifiably attacking Plaintiff and their actions in the aftermath of the attacks, violated Plaintiff's right to be free from punishment and deprivation of life and liberty without due process of law and to be free from deliberate indifference to those rights.

125.    The use of force was not in an effort of good faith to restore discipline, but rather was used maliciously and sadistically to hurt Plaintiff.

126.    Defendants were aware of the repulsive and dehumanizing conditions within the Prison subsequent to the attacks.

127.    In committing the acts and omissions complained of herein, Defendants acted under color of state law to deprive Plaintiff of his constitutionally protected rights under the First, Eighth, Fourth  and Fourteenth Amendments to the United States Constitution.

128.    The unlawful conduct of Defendants was willful, malicious, and oppressive and was of such a nature that punitive damages should be imposed.

129.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 (Deliberate Indifference to Serious Medical Needs & Safety, including Failure to Protect & Unconstitutional Conditions of Confinement)

130.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

131.    As described in Plaintiff's Statement of Facts, there were unreasonable risks to Plaintiff in general and also personal risks.

132.    Here, Plaintiff's deprivation of rights throughout this extended experience or sequence of events were sufficiently serious.  Moreover, the deliberate indifference was so sufficiently serious that a reasonable person in Defendants' position would perceive that treatment was worthy and in many cases throughout this experience, necessary.

133.    In addition to Defendants directly participating in the deprivations, Plaintiff also

spoke at several different times and told the officers and medical providers exactly what was wrong or what his issue was at the specific moment.

134. Defendants failed to protect Plaintiff from the known and persistent brutality and they knew that they were placing Plaintiff at a substantial risk of serious harm when they dragged him out from under his bed and continued to beat and attack him for a protracted amount of time. This indifference continued for hours.

135. Defendants also disregarded Plaintiff's serious and substantially dangerous need for decontamination from the chemical agent.

136. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Plaintiff's safety and well being.

137. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Plaintiff's serious medical needs.

138. In committing the acts and omissions complained of herein, Defendants enabled and ignored Defendants' attacks on Plaintiff, either with malice or with negligence.

139. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Plaintiff's serious medical needs.

140. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Mr. Kennedy's serious medical needs when they denied him medical attention and treatment.

141. In committing the acts and omissions complained of herein, Defendants acted with deliberate indifference to Plaintiff's safety and health while refusing to intervene.

142. In committing the acts and omissions complained of herein, Defendants acted with deliberated indifference to Plaintiff's health and safety while ignoring his pleas of difficulty breathing, difficulty walking and difficulty talking.

143. In committing the acts and omissions complained of herein, Defendants acted under color of state law to deprive Plaintiff of his constitutionally protected rights under the Eighth and Fourth Amendments to the United States Constitution.

144. As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

145. Defendants exercised deliberate indifference, failure to protect, a disregard for Plaintiff's safety, denial of medical attention, cruelty, extreme recklessness, and intent to known and probable risks to Plaintiff by failing to take remedial action and allowing a dangerous environment to become so pervasive at Upstate by allowing the abuse, attacks and dangerous conditions to exist.

146.    The Defendants were aware of a risk to the life and safety of Plaintiff and failed to act and/or acted improperly, in deliberate indifference to Plaintiff's federally-protected constitutional rights.

147.    Accordingly, Defendants violated the 8th Amendment because they acted with deliberate indifference to the health and well-being of Plaintiff.

148.    Defendants had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard for Plaintiff's rights failed or refused to do so.

149.    Defendants failed to comply with DOCCS policies and/or directives concerning adequate supervision and/or protecting incarcerated individuals from violent assaults.

150.    Defendants also failed to provide adequate medical treatment in a timely fashion and refused to ensure that Plaintiff received the proper treatment.

151.    Defendants were objectively aware of the serious risk of harm should Plaintiff not receive medical treatment and violated contemporary standards of decency by denying him timely and adequate medical treatment.

152.    Defendants determined Plaintiff to have objectively serious medical needs.

153.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

154.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § § 1983, 1985 and 1986
### (Civil Rights Conspiracy to "Cover-Up", Failure to Prevent Conspiracy & Spoliation Therefrom)

155.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

156.    Upon information and belief, the Defendants agreed among themselves and with other individuals to act in concert to deprive of his clearly established rights, including but not limited to his right to be free from cruel and unusual punishment and to receive necessary care for serious medical needs.

157.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, assaulting Plaintiff, denying him necessary medical care, and upon information and belief, submitting false statements, deleting and or destroying "evidence," manufacturing false evidence to hide their malfeasance and wrongful

death.

158.    The Defendants knew that acts previously mentioned, which violated Plaintiff's constitutional rights, were about to be committed, and they had the power to prevent or aid in preventing the commission of the same, but they neglected or refused to do so.

159.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

160.    The Defendants are therefore liable for Plaintiff's injuries under 42 U.S.C. § § 1983, 1985 and 1986.

161.    The Defendants' actions were willful, malicious, oppressive, and/or reckless, and were of such a nature that punitive damages should be imposed.

162.    Defendants failed to preserve evidence, specifically the handheld and stationary cameras from approximately 2:30pm to approximately 5:30pm that recorded pertinent parts of the series of events that comprised this incident and were purposefully lost or destroyed.

163.    In committing the acts and omissions complained of herein, Defendant E. DRUMMATTER acted with intent to cover-up while filming and while purposefully obstructing his camera during the most abusive moments of Plaintiff, including when they waterboarded him using the spit mask.

164.    Defendants purposefully failed to capture the entirety of the July 30 incident on camera (and/or edited after), instead filming the backs of Defendants, walls, or inappropriately zooming in as to avoid capturing the abuses directly on camera–but nevertheless documenting what was occurring.

165.    The destruction of the three hour long camera footage was intentional to cover-up the excessive force and negligence of Defendants and as a result of this cover-up, Plaintiff was deprived of access to court.[7]

166.    Therefore multiple electronic recordings of Plaintiff were either destroyed or purposefully not preserved, either intentionally or unintentionally, with wanton disregard for Plaintiff's due process rights.

167.     As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

### FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 (Failure to Intervene)

168.    Plaintiff realleges and incorporates by reference each allegation set forth in the

---

[7] *See Christopher v. Harbury*, 536 U.S. 403 (2002).

foregoing paragraphs as if fully set forth herein.

169.    Defendants were under a duty of safeguarding the public and ensuring the appropriate execution of Defendant's role.

170.    Plaintiff duly relied on Defendants' fulfillment of their duties.

171.    Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence.

172.    At the time of the incidents, Defendants were observing and aware of the wrongful acts against Plaintiff.

173.    At the time of the incident, Defendants neglected to intervene on Plaintiff's behalf in dereliction of their duty to Plaintiff and in deliberate indifference to Plaintiff's well-being.

174.    Defendants violated Plaintiff's constitutional rights when they failed to intercede and prevent the violation or further violation of Plaintiff's constitutional rights and the injuries or further injuries caused as a result of said failure.

175.    Defendants had an affirmative duty to intercede when Plaintiff's constitutional rights were being violated in Defendants' presence by assault, abuse and punishments.

176.    Defendants had reason to know that the Plaintiff was under attack and had extended opportunities to stop or otherwise mitigate it.

177.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

<u>**FIFTH CAUSE OF ACTION**</u>
**42 U.S.C. § 1983 (1st Amendment Retaliation)**

178.    Plaintiff realleges and incorporates by reference each allegation set forth in the foregoing paragraphs as if fully set forth herein.

179.    Defendants violated Plaintiff's constitutional rights when they retaliated against him for Plaintiff's prior grievances against them; for his grievances against them for being harassed and threatened by them; for his grievances against them for being the victim of racist slurs and for his grievances against them that overall, he was scared for his life.

180.    Defendants, specifically but not limited to E. GAVIN, C. COX and R. HOOKER, retaliated against Plaintiff when he used his rights to grieve their abuses.

181.    Plaintiff was directly threatened and attacked in the days leading up to this ultimate wrongful death and the previous grievances were part of the reason or the reason for the assaults and the assaults occurred in close proximity to the time of the grievances, which named officers

and reasons for fear of retaliation and the wrongful death was the legitimate cause and effect of Plaintiff's grievances.

182.    Defendants retaliated against Plaintiff in response to his serious mental health needs.

183.    Subsequently, the aforementioned abuses and wrongful death occurred, in response to his prior grievances against Defendants and mental health symptoms and as such, Plaintiff was left to die in his cell.

184.    Defendants retaliated against Plaintiff and connected the punishment to the grievances made and retaliated against Plaintiff when he was begging that he could not breathe, did not want to be killed and could not walk on his own.

185.    Lastly, Defendants retaliated against Plaintiff when he was begging that he could not breathe.

186.    Plaintiff was also denied medical treatment in retaliation for making complaints against the officers.

187.    As a direct and proximate result of the deprivation of his constitutional rights, Plaintiff suffered the injuries and damages set forth above.

### SIXTH CAUSE OF ACTION
### Title II of the American with Disabilities Act, 42 U.S.C. §§ 12131-34 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 as Against Defendant DOCCS [8]

188.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

189.    Defendant NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, acting through its agents, violated Plaintiff's rights guaranteed by the Americans with Disabilities Act and the Rehabilitation Act.

190.    Plaintiff is a qualified individual under the ADA.

191.    Plaintiff is an individual with disabilities as defined by Executive Law § 292 (21).

192.    The lack of accommodations to Plaintiff were not reasonable, especially but not limited to the months leading up to Plaintiff's wrongful death.

193.    There was a reasonable level of accommodation available but it was not provided to Plaintiff during that period.

---

[8] This is the only Cause of Action being brought against Defendant DOCCS.

194.    By failing to follow the prescribed guidelines for mental health conditions, disciplining and abusing Plaintiff because of his mental health symptoms and failing to provide Plaintiff with his required mental health care, medication and encounters, among other programs, Plaintiff was denied access to and discriminated against due to his mental health conditions

195.    On information and belief, the prescribed guidelines for mental health conditions were adhered to for other incarcerated people.

196.    By reason of the State of New York's acts and omissions, Plaintiff endured substantial physical and emotional injuries, including death, and was otherwise damaged and injured.

197.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands the following relief against Defendants, jointly and severally:

(a)    compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

(b)    punitive damages to the extent allowable by law;

(c)    attorney's fees;

(d)    the costs and disbursements of this action;

(e)    interest; and

(f)    such other and further relief as this Court deems just and proper.

Dated: New York, New York
          August 6, 2025

Yours, etc.

_Ellie Silverman signature_

Ellie A. Silverman, Esq.
Ellie Silverman Law P.C.
*Attorneys for Plaintiff*
745 5th Avenue, Suite 500
New York, New York 10151
(646) 993-7478
ellie@elliesilvermanlaw.com